The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. We'll hear argument in No. 20-1785 Bio-Rad Labs v. ITC. Mr. Cannon, begin whenever you're ready. Thank you, Your Honor. Good morning. May it please the Court, this is Brian Cannon for Bio-Rad. Your Honor, this case is about being able to sequence expressed DNA from a single individual cell. The work that solved this problem was started at a company called Quantalife. It was largely completed at Quantalife, but it was patented shortly after at 10X. Mr. Cannon, this is Judge Taranto. Can I just ask, I guess they're kind of housekeeping questions. Are both the Quantalife and Bio-Rad assignment provisions still enforceable? Are both relevant here? Did the Bio-Rad one supersede the Quantalife one? And, I guess, relatedly, do you see any difference between the Quantalife pair of agreements and the Bio-Rad pair of agreements? Thank you, Judge. The work that was performed was performed pursuant to the Quantalife agreement, and that is at Appendix Site 3199. So that is the agreement, the language of which the parties have been focusing on, because the two inventors in question, Heinzen and Saxenos, they did their work at Quantalife under the Quantalife agreement. Bio-Rad acquired Quantalife. Another employment agreement was entered. And then the two inventors left within about a year to start 10X. What about my last question? Do you see any difference in scope between the Quantalife pair and the Bio-Rad pair? There's no real significant difference in scope. The Quantalife agreement, yes. I'm sorry, did I answer the question, Your Honor? Yes, slightly different wording, and I just wanted to know if you were making anything of the difference, but you're not. We are not. One difference, the Quantalife agreement does have this provision where the inventors have to disclose, for three months after they leave the company, disclose any IP they come up with. But that provision was not actually litigated and is not particularly relevant to the issues on appeal. But in terms of the assignment provision and who owns what, there's no significant difference between them, and the relevant provisions are at Appendix 3199. And, Your Honor, the reason the 10X has these patents is because the two of the, I think, total six inventors on these patents worked at Quantalife, and then when Bio-Rad acquired Quantalife, they left and they formed 10X. And it's our position that under the contract that Your Honor has identified, Bio-Rad owns – I'm sorry, did someone ask a question? No. Bio-Rad owns a share of the later filed patents based on the work that was done under contract. So I want to be clear that Bio-Rad is not seeking complete ownership of these patents. It is seeking ownership based on the work that was done at Quantalife. Can I ask you this question? So we have an agreement that I think you characterized in your reply brief as requiring assignment of, quote-unquote, intellectual property. Yes. Why isn't the right way to look at this as follows? There has to be intellectual property, which is to say legally protected property in ideas. And while an eventual invention is such a thing, whether conception or completion with reduction to practice, work that goes into that, even if a significant contributor, is not itself intellectual property. And since the timing rule is that the intellectual property must exist during the term of employment, work that is merely a significant contributor in a way that would justify joint inventorship doesn't qualify. Your Honor, I agree with part of your premise, but not the complete premise. And the reason is twofold. First, the contract is broadly written. It really could not have been more broadly written. And I know it refers to IP, but the key issue is ideas. It's the broadest possible description of IP you could come up with. Right. But that, of course, is so broad that it would be problematically broad unless it were limited, as at least your reply brief description does, to intellectual property. And that limitation is more or less or maybe even more implicit in the opening phrase of the assignment paragraph about an employee's entire right in the thing. So that there has to be some legal cognizability of a right in the particular idea, for which I think intellectual property is a pretty good term. So on the assumption that there does have to be intellectual property, how does work that merely becomes a significant contributor to a post-employment piece of intellectual property qualify? Your Honor, this is where I think the principles of joint inventorship come significantly into play. And I'd like to answer that in two ways. Looking back to the Film Tech case from 1992, in that case an invention was started at one company and then completed at a second. And just because the invention was completed at a second company did not negate the work that was started at the first company. And with respect to joint inventorship, I think those principles… I'm sorry, was that the Film Tech? Is that what you were referring to? Yes, it was. Okay. Film Tech, the Hydronautics, 982F2nd, 1846. Correct me if I'm wrong, and I may well be. My recollection is that that was the case about a contract that mirrored a statute that said anything conceived in the scope of the project had to be assigned to the United States. And the court said, yes, this was conceived during the scope of the project. I'm not sure that involves work that is no more than a significant contribution to a later conception, let alone complete invention. I think that's the other Film Tech case. There was two Film Tech cases from 1992. In this particular Film Tech case, there was an invention. The defendant was Hydronautics. In this case, the invention was started at the first company, and then the limitations were not completed at the second company. And under the contract, the Federal Circuit, Judge Lurie ruled that the first company had an ownership interest in the contract. But I would like to get back to joint inventorship principles, because I think those are very helpful guidance. I don't think the Bio-Rad needs to prove, you know, by clear and convincing evidence, certainly not joint inventorship. But the principles can guide the contract interpretation here. And in the AT&T case that we cited in our reply, and that was Judge Mayer's case, the court said, you know, if you're interpreting a contract, you can look to patent principles to guide what is being meant or what is being understood by the contract. And here, any individual joint inventor, if you have multiple inventors, which is the case here, each inventor does not have to conceive of the entirety of the invention. And in fact, inventions can happen over time, and that is actually codified under the Patent Act. So if you have an inventor that starts an invention, let's say Inventor A, makes significant work on the invention and passes it off to Inventor B, a second person, even if there's no complete invention, once the invention is completed, there's no retroactive negation of the earlier work. In fact, the law says that the earliest inventor, Inventor A, is a fully valid joint inventor. And I think the idea that inventions can happen over time is codified under the Patent Act, and it's a common-sense way of looking at how inventions happen. If significant work is started, if ideas have come up, are developed, even if they're not finally completed until later, the later work doesn't negate the earlier contributions, even if it's by the same person. Mr. Cannon, this is Judge Chen. Let me just ask a quick hypothetical. If the only inventor involved in this case was Hinson himself, and Hinson did all the work that you allege Hinson and Saxenoff did at Bio-Rad, and then Hinson by himself moved over and started 10X, and then invented everything that's involved in these 10X patents. So all we have is Inventor A at Bio-Rad moving over, and then Inventor A at 10X. Would you still be able to make the same joint inventorship argument that you're making today? No other co-inventors are involved. Understood. Yes, Your Honor, because joint inventorship is the appropriate guideline. It's the appropriate sort of common-sense framework to look at how… Right, but if he made significant contributions that, in a certain way, would qualify him as a joint inventor at the earlier company, that would be enough, I believe, to trigger these contracts, because the contracts were intended to protect, to the fullest extent, intellectual property, as Judge Toronto pointed out. Right, but then we would be in a position where we'd have to say he somehow self-collaborated in order to apply your joint inventorship theory. I don't think so, Your Honor. I don't think you have to sort of make that leap to that final position, because under the FilmTech case, that's essentially what happened. There was an invention for a membrane with certain qualifications, certain limitations, which was started at one company and the same inventor finished it, completed the final limitations that were patented at the second company, and the first company had rights. I think the reason for that is because joint inventorship is certainly an appropriate guideline, but it is not… In FilmTech, didn't we say that the claims were conceived in their entirety at MRI, the first company? They were conceived within the meaning of the contract, and what's interesting about that is even if a contract says conception or invention, it's not strictly limited to the patent laws, and it's not a strict patent law technical definition of that concept, and that was set forth in the AT&T case, also from 1992, that we cited. But, Your Honor, if you look at Appendix 3.4… Mr. Cannon, can I just… I just need to clarify something. I thought I heard you say that there were two FilmTech cases. One was the one that I had in mind, and I think the only one cited in the briefs, 982 F. Second, 1546. Are you talking about a different FilmTech case now? I'm talking about 982 F. Second, 1546. Oh, okay. I thought there was only one. Okay, and that is the one that says the relevant statute, then copied into the contract, says the United States gets anything conceived during the term of the project, and the work done in the opinion was all about when was the invention conceived, and the answer was during the term of the project. I'm not sure where this mere significant contribution that is less than conception is coming from. Well, the issue in that case, Your Honor, and I'm pulling up the opinion now, is that certainly limitations were not complete. I'm trying to find the actual… Right, right. The court said one thing that the contract wouldn't allow in order to fulfill its intent, because the statute also wouldn't allow, is adding in a few minor limitations into the claims, but what one has to look at is the common core invention. But still, that's what was conceived. Well, Your Honor, I would argue two things. One, I'm looking at the decision, and the argument was FilmTech argues that the membrane did not constitute conception of the claimed invention because the flux and salt rejection were below the limits stated in the claims. I mean, if something's in the claims, it's in the claims, and then the Federal Circuit rule held that those facts will not defeat a finding that the inventor conceived the invention within the meaning of the contract. I know I'm into rebuttal time, Your Honor, but I really would like to point the court to the image slide. Mr. Cannon, this is Judge Stoll. I actually want to ask you a question too. Yes. The commission held that even under your theory based on joint inventorship principles, Bio-Rad had not shown that the ideas relied on were distinct from the prior art. I mean, again, borrowing from joint inventorship principles, that would seem to suggest that those ideas, if they're not distinct from the prior art, even if your theory is that we should be borrowing from joint inventorship principles, then what Dr. Saxenoff and Dr. Hinton developed was just in the prior art, is not actually part of the claimed invention. Your Honor, at least in other joint inventors, when they were at Bio-Rad, their contributions weren't joint inventorship contributions. Judge Stoll, thank you for asking that question because I want to make very clear that the appendix site I was talking about and the work that was done in 2011 was absolutely not prior art at that time. At the time, it was confidential, it was maintained confidential, and it was cutting-edge research about how to use droplets to tag barcodes. May I just finish the answer to that question? Yes, go ahead, please. And so the 059 patent and the commission below points to the 059 patent to say, look, this was just in the prior art. But I want to be very clear, the 059 patent, which has Saxenoff as an inventor, and that's in appendix 2111, that patent was not published until December 2012 after the inventors left to form 10X and after the work that was done at Quantolife. On that point, Mr. Conant, can you just clarify, when you argued anticipation under the 059, was that a 102E argument or was that a 102A or B argument? And it's sort of related to the question whether you accept the conception date of the current patents as no earlier than January 2013. Your Honor, we argued the 059 patent included all of the limitations, and we lost on that. I didn't make my question clear. Is that a 102E argument or under a different subsection of 102? I believe it was a 102A argument, although, like I said, we lost that. Okay, so that was then public prior art before the conception date, if only by a month. It was technically after the fact, but the publication date was December 2012. So it was published later. Now, retroactively, it became prior art because of its initial filing date, but at the time the work was done, at the time our joint inventorship principles applied, it was not prior art and it was not public domain. It was published later. And then the patents, I just also want to just make clear a final point. The patents certainly don't exclude overlapping subject matter. The contracts don't say you get one patent and then you… Mr. Cannon, this is Judge Shannon. I got lost in this colloquy. Just so I'm following, below you had an invalidity argument in which you relied on the 059 patent as prior art against these three patents. Is that right? Correct. Okay. That's all I need to know. And if I may just respond that if a joint inventor provides prior art, the idea of the joint inventorship principles is that the alleged joint inventor is just providing what's already known at the time, public domain information. If inventing and development work is all happening at the same time and it's not public, I don't think that principle ought to apply. And what is the particular idea that you say was not public prior art at the time of the Hinson-Saxonoff quanta life work that you're relying on? It is three appendix sites I would like to give you. Appendix site 3442, which is reproduced in the blue brief at page 27, and that shows droplets being tagged for next-generation sequencing to obtain single-cell level resolution. And then appendix site 2904, which shows the double-junction microfluidic device, which is claimed in the 468 patent. And then appendix site 2907, which is an April 2011 email from Saxonoff that sets forth using oligonucleotides, specifically oligonucleotides, as barcodes to tag single cells within droplets. That is the material that was not public domain, not prior art at that time, that we allege is the basis under the contracts for Bio-Rad's ownership share. Thank you. Your Honor, I know I've gone over, so I appreciate you letting me answer. Unless there are further questions, we'll hear from Mr. Richards and restore your rebuttal time. Thank you. Mr. Richards? Yes, Your Honor. I'm ready to proceed, if I may. Please do. Thank you, and may it please the Court. I'd like to just jump right into the ownership issue, since that's really the sole issue on appeal that's going to touch on all three of the asserted patents. The ownership issue here is not nearly as complex as it has been made out to be. Hinson and Faxenoff signed short employment agreements, first at Quantalife, then at Bio-Rad. We would agree that for the purposes of this appeal, there's no substantive difference between those employment agreements. They both included assignment clauses, and in those assignment clauses, Hinson and Faxenoff were obligated to assign their rights in patents, I'm sorry, their rights in inventions and ideas, if they were conceived during the term of their employment, either at Quantalife or at Bio-Rad. That durational limitation is in both sets of contracts. And what that means is that Hinson and Faxenoff are only obligated to assign inventions and ideas that they conceived while they were actually employed at Bio-Rad. Here, that makes the single operative question, did Hinson and Faxenoff conceive of the inventions claimed in the Tenet's patents while they were at Bio-Rad or Quantalife? Mr. Richards, this is Judge Toronto. I think you're kind of right at the core of at least what is in my mind. When you said, and that makes the question, it seems to me you asserted a conclusion to the question that is, I think, actually at issue. Why doesn't it include significant contributions to the later conception of the invention? So, the answer to that, Your Honor, I'm sorry, did I interrupt you? No, no, you didn't. Go ahead. I think as you suggested in your question to my friend a moment ago, the issue here is that what Bio-Rad is claiming is ownership interests in the complete invention in the Tenet's patents. That's what it needs here to find relief from the violation of Section 337 is ownership of the patents, not ownership of discrete individual ideas. So, right, while it is absolutely true that the plain language of the contract says they are broad enough to cover ideas, even unpatentable ideas, which I suppose could be a trade secret or something like that, the fact that they're broad enough to cover that is immaterial to the ownership rights Bio-Rad is actually seeking here. It's seeking ownership rights in complete patented inventions. And so, the question under the contract is whether the thing it's seeking ownership rights in was conceived by Hinson and Saxenoff during the term of their employment. Now, the ALJ addressed this question. She credited Hinson's timeline of when conception happens, which leads to conception in the January to February of 2013 time period, which is eight months after Hinson and Saxenoff left Bio-Rad. And as has been noted, it was with the help of additional non-Bio-Rad inventors. Notably, and I think I heard it again this morning, Bio-Rad has never actually disputed that conception of the complete inventions claimed in the Tenet patents were conceived in that 2013 timeframe. That should be the end of this question altogether. Instead, what we know from Bio-Rad's reply brief is it's now trying to rewrite these assignment obligations so that they cover, quote, all possible intellectual property that may arise from Hinson and Saxenoff's work at Quantalife or Bio-Rad. That is a very different obligation from what's actually written in the contracts where Hinson and Saxenoff are obligated to assign their rights in inventions they conceived during the term of their employment. Notably, that's the kind of language that's similar to what we saw in the Stanford case. What do you make of the whether or not patentable language at 3199? Well, again, what I would say, Your Honor, is that that language is scoping what intellectual property can be assigned. Right, so these assignment obligations may entitle Bio-Rad to ownership of an unpatentable idea, whatever that means. Bio-Rad has never explained what rights are attached to unpatentable ideas. And of course, ownership of an unpatentable idea is not the same thing as ownership of an examined patented invention, which is what we're talking about in this case. And what Bio-Rad would have to show ownership rights in to get relief from the commission's finding of a violation of Section 337. So I don't think the commission disputes the plain language of that contract is broad enough to cover these unpatentable ideas. But I don't think there's any dispute that the unpatentable ideas are not the patented inventions in the 10X patents. If I could make a couple points responding to what my friend mentioned in just a minute ago. Concerning the Film Tech case, I want to be clear. I think as Judge Chin pointed out, Film Tech at page 1553 found conception of the invention. That wasn't a case where there was this idea of partial conception. It found complete conception. What happened in Film Tech is that this desalination membrane was discovered entirely at one employer. But then when it was actually patented in the court's own verbiage, some narrow performance limitation, essentially how effective the membrane would be at desalinating seawater, was added. And the court held the addition of those narrow performance limitations wasn't sufficient to take it outside of the scope of the assignment clause. Factually, that's not where we're at here. There's been no assertion that what was added after the fact was narrow performance limitation. I guess what I'm trying to figure out about Film Tech, though, is it wouldn't be factually accurate, would it, to say that the entire claimed invention in that case was in fact conceived of by the inventors when they were at the first company? Because in fact, the claims did in fact include those certain performance elements or whatever they were that were unquestionably not thought of back at the first company. Is that correct? It felt like the opinion seemed to be doing more of a, well, what is the true heart of the invention type of inquiry in examining the claim? Doing more of a central claiming analysis rather than a peripheral claiming analysis to try to imagine what the heart of the invention is. And so that's how we'll judge conception of the claimed invention. Is that fair to say? I'm not entirely sure it's fair to say. I understand that reading. You talked about limitations and a key distinction between the claim and the prior art, right? Was the structure. Well, it did. That's certainly true, Your Honor. It did look to the point of novelty as one way of sort of focusing on what was important for conception. The part I wanted to make a distinction about is I'm not actually sure the film tech opinion ever comes to a conclusion of saying those performance limitations weren't thought of at the prior company. I think the issue is that there was no evidence one way or the other. You've got the claims that show these performance limitations, and you have, I think what it was, was evidence showing the structure of the membrane from the prior employer. But before you go, for purposes of the opinion that was written by this court, it was entirely beside the point where those performance elements were invented slash discovered, whether it was that company A or company B. Is that a fair way to read the opinion? I think that's true, Your Honor. And if you were to apply that here in this case, I should ask. May I finish my answer? Yes, please do. If you were to apply that point from the film tech case about looking to the point of novelty, again, we know because Bio-Rad argued anticipation below and failed and didn't appeal it. We know that the point of novelty is this porous gel bead with releasably attached oligonucleotides. Or rather, I should say, we know it's at least that. I will note that of all the ideas Bio-Rad has pointed to as being conceived at Quantalife, a porous gel bead with releasably attached barcodes is not among them. Of that laundry list of ideas in its brief, there is no mention of releasably attached oligonucleotide barcodes. So if you were to apply the film tech idea of when conception occurs, Bio-Rad would fail under that as well. Thank you. Thank you. And Mr. Powers? Thank you, Your Honor. May it please the Court, I'd like to begin by addressing Judge Taranto's question about why Bio-Rad does not have an interest in the patents based on an interest in what Bio-Rad contends are constituent elements of some of the limitations of the claims that are, quote, ideas, close quote, conceived at Quantalife. And I think the answer to that begins with the point that Judge Taranto made earlier, which is there is no right to something until it exists, and there is no protectable interest in patent claims until it was conceived. There's no dispute in this record, and there can't be, that the claims to which Bio-Rad seeks rights did not exist as a claim until 2013. There was no conception until then. Mr. Powers, I think you'll understand my question. Address the point that Judge Chen was pressing about how film tech seems to rely on something less than conception of the claims as written. Certainly, Your Honor. So film tech is clear in the sense that it was relying on a contract which, as Your Honor, Judge Taranto pointed out, is based on a government statute. And the decision at 1288 is, I think, quite clear. Hydronautics argues, quote, that the district court… I'm sorry, I'm sorry. 1288? Oh, that's USPQ 3rd. So it's 982, 1540, hold on, 1551. Thank you. It's a paragraph that starts, Hydronautics argues that the district court erred as a matter of law by resolving the issue of title to the 344 patent according to the patent claims rather than according to the terms of the contract. We agree. As we determined above, under the contract, the government has title to all inventions on in situ condensation polymer membranes conceived or first produced to practice by CADET at MRI between two dates. We conclude that the invention of the 344 patent was conceived while CADET was at MRI and that the district court erred in not so holding. I think that is clear that it's being governed by that particular contract with a particular term relating to government's rights. I think the more applicable case is the Amgen case. The Amgen case, your honors will recall, had three claims, one of which, claim one, was conceived during the term of an agreement and therefore the first company, the company in Bio-Rad's position, had rights to it. The claims two and three were conceived after the agreement. The court's holding is quite clear that the party in Bio-Rad's position had no rights to claims two and three as claims two and three because it was conceived after the term of the agreement. Well, given the language of the agreement, I guess my takeaway from all of this is that one needs to look at the language of the agreement and there the language of the agreement we interpreted to be limited as to assignment or as to ownership to what was in fact conceived during the term of the project. Even, therefore, to exclude post-project conceptions that were essentially follow-on work to what was done during the project. I take it your point is the contract language here is – we have to pay attention to the particular contract language here. Exactly so, your honor. Is it similar enough and different enough from the film tech language? Exactly so, your honor. The reasoning of the Amgen case and the language of the Amgen case is quite clear that even though the claims two and three were argued to be a follow-on from claim one, the earlier company in Bio-Rad's position had no rights as to those claims. And the only reason there was a pro-Rad interest in the patent was because the claims were all included in the same patent but they had no rights to those claims. And so that if claims two and three had been in a separate patent, the party in Bio-Rad's position would have had no rights in them at all. That reasoning and language is irreconcilably inconsistent with Bio-Rad's position here. Bio-Rad also relies on the Stanford case. Can you talk about the three particular ideas at 3442, 2904, and 2907 that Mr. Cannon identified, none of them involving the porous gel bead with releasably attached oligonucleotides? That is, none of them involving that combination, each of which I think he said were not in the public domain at the time that Mr. Hinson recorded those ideas while he was at Quantalife. Yes, your honor. Droplet tagging, you know, second junction and use of oligonucleotides as the tags. Yes, your honor. I think the first and most important point is the point you just made, which is none of that includes releasable barcodes or porous gel beads. And the invention requires those two things. Right, but I guess I probably should have introduced it by saying let's assume that we think that there's a possibility that the contract here would reach something that would qualify as a significant contribution for joint inventorship purposes. And I know your main argument is no, it doesn't reach that. Let's assume it does. Then the question is, is it nevertheless an affirmance because the commission and ALJ reasonably found that none of these ideas, which seem like fairly significant contributions to the ultimate combinations in these three patents, that none of those really were significant contributions because they were all public? So the first response is exactly that, your honor, which is that although they were not public at the time Dr. Heinsohn noted them down, they were in fact part of the prior art in the 059 patent. And secondly, they're actually quite different. So this is all part of a droplet in droplet architecture, which is a very different architectural approach to the gel bead or gem architecture that is the core of the patents. And if you're within a joint inventorship regime, which first I don't think you can be because it's the same human beings, which goes to Judge Chen's point about Dr. Heinsohn being the sole inventor. I think that hypothetical is a perfect hypothetical. But second, even if you got past that, there is no collaboration between the earlier versions of Dr. Sachsenhoff and Heinsohn and their later version because this is simply using what's in the prior art in the 059 patent and then building on it. Under their theory, every prior artist who contributes something would then become a joint inventor of another invention made later using one of those limitations to make a broader invention or a narrower invention. Mr. Powers, are all three of the ideas you were just discussing prior art before January of 2013? I believe all three are in the 059 patent, which was being argued as prior art below. I will note, for example, that 3442 is really just a future possibility being discussed for what's a very different type of technology, which is DDPCR, which is what Quantalife commercialized. This is just a slide saying, oh, by the way, perhaps this technology, this droplet and droplet technology, which is very different architecture from the gel beads, might be used for this type of single cell analysis. That is not a conception of all single cell analysis. That's merely saying maybe we could use this droplet and droplet architecture for that. Mr. Powers, this is Judge Chen. In terms of the double junction microfluidics device, does the article beating Poisson at A2684 figure 1B illustrate an example of that kind of microfluidics device? Yes, it does, Your Honor, and that is prior art. The double junction, I don't think there's a dispute, was in prior art, not just Dr. Heinsen's, but otherwise. Can I just ask, at least for me, one final question? Is it your position, and do you know, does everybody agree that we should be addressing all three patents, even though I gather all of the products are covered by the first two, but there's at least one product that's just not covered by the 530? I'm not sure, Your Honor. All three are certainly on appeal as to whether there's a product that's covered by 530 that's not covered by the first two. Is that your question? No, no, no. I remember the government brief saying the other way, that there's one product not accused, that you didn't accuse under the 530, but that everything accused under the 530 is also accused and, indeed, excluded under the 024 and 468. That's correct, Your Honor. Does that moot the issue about the 530, which maybe has a – I don't know even whether it has a different expiration date. That's, I guess, the question. Let me look to see the expiration date. The 530 has a slightly later expiration date than the first two, by two years. Okay. Mr. Powers, is the earliest priority date that your client is claiming for these three patents January 2013? Yes, Your Honor. Okay. And there's no dispute in the record on that because the ALJ found that an attempt to argue inconsistently with that would be precluded, and that ruling has not been appealed. So that is not disputable on this record by Bio-Rad. If Hinson and Saxenoff had come up with the gem architecture at Bio-Rad, then would you agree that Bio-Rad owns these patents, at least in part, if not the whole thing? If they'd conceived of the claim, yes. No, just gem architecture. The use of a gel bead as a vehicle to, you know, releasably attach a million oligonucleotide barcodes so that you can tag all these different DNA fragments. Just that piece, which is a big piece, but nevertheless, that piece. If just that piece, then the answer, I think, is still no because there's not a complete conception that Bio-Rad could claim ownership in because it doesn't exist yet. And just to return to where we sort of started, how does that answer square with Film Tech? Because Film Tech is being governed by a different agreement with which the court relied upon as tracking, as Your Honor noted, a statute that has different purposes. And the holding there was it was entirely conceived during the term of the agreement and therefore governed by it. That holding can't apply here. Okay, if my colleagues have no further questions, we should shift this back to Mr. Cannon for rebuttal. And you'll have six minutes. Thank you, Your Honor. Brian Cannon for Bio-Rad. I just want to address some of the points that were raised. I think Judge Chen raised the beating Poisson article at Appendix 2684. And I do not believe that shows a double junction. That is a single junction micropolytic device. But it does show the use of gel beads to encapsulate—excuse me, droplets to encapsulate gel beads. The commission—actually, before I get to what the commission argued, Tenex's counsel did concede that when Dr. Heinsohn wrote the ideas down for these slides together with Dr. Saxenoff, they were not public at the time. So the appendix sites that I focused—tried to focus the court on, this was not public domain information at the time. In fact, Tenex—one of Tenex's arguments is, oh, this is just forward-looking research plans. Well, they're a little bit more than forward-looking research plans. They really do, you know, go through almost every element of the claim in really quite a bit of detail. It's not just a hope to do next-generation sequencing to isolate single cells. It's an actual step-by-step process to do so. And that is the significance of the information set forth on 3442. It includes droplets, single cells, barcodes, and then ultimately amplifying the material in order to sequence the DNA. And counsel for the ITC said that there's nothing about using oligonucleotides as the barcodes at Quantilife. That's actually not accurate. At 2907, which is the Saxonoff email, Dr. Saxonoff at Quantilife specifically discloses using oligonucleotides, which is a short DNA sequence, as a barcode for use in a system to isolate a single cell and track through the sequence for the expressed DNA from that single cell. And I think the questions about FilmTech are exactly on point because in FilmTech, you know, a limitation in the claim is a limitation, and if that final limitation is not done, then you do not have complete conception under the patent laws. And in FilmTech, I think it's clear that those final limitations happened later. And applying the contract, you know, complete conception was not required, just like complete conception was not required under the Bio-Rad Quantilife contract. Just very quickly, can you tell me what was wrong with what the commission had said during its response, that what this contract represents is Bio-Rad's entitlement to any protectable ideas that Saxonoff and Hinson worked on at Bio-Rad. But it doesn't – it isn't so far-reaching that it also reaches out and grabs any patentable inventions that are later actually conceived and invented that may arise in part from those ideas. Thank you, Judge Chen. I disagree with that interpretation of the contract. The contract, by its clear terms, does not require a complete conception under the patent laws, meaning every single limitation of the claims to have occurred at Quantilife and Bio-Rad. As I believe Judge Taranto raised at the beginning, it has a broad definition of IP. And in this case, looking at, you know, joint inventorship as a guideline, as I mentioned before, if a significant amount of work is done at Quantilife, and that, you know, that can count as joint inventorship or not. But just because an inventor left, finished the invention somewhere else, does not retroactively negate the prior work that was done on the contract. And I think if, you know, companies that invest in research and have these contracts, I think they're entitled to a broad, you know, broad enforcement and broad scope of that contract. And an employee cannot just leave, complete something that was started, and then retroactively get out of a contract that they were in before. And it is like film tech, and it's a little bit like the Stanford v. Roche case, where one inventor out of three worked at Roche, came up with, you know, whatever he came up with, went to Stanford, and then Roche had a pro-rata ownership of the later patented invention at Stanford. Well, one difference between this and Stanford was explained in our decision a few months ago in the Whitewater case that Stanford actually is ultimately not a case about employment, because Halodny was essentially part of a contractual relationship between Stanford University and what was then called Cetus, which eventually became Roche. And so the very strict California law limits on post-employment restraints for employees didn't apply. But here they do. And it seems, not to say anymore, somewhat worrisome about using language no more precise than the language in this contract to reach inventions conceived after employment, worrisome for, let's just call them, 1600 and Whitewater reasons. Well, Your Honor, 1600 was raised as a defense in the Stanford v. Roche case, and the reason it was not applied is because it was not because of the particular, I think, employment relationship. It was because at the time Dr. Halodny was a Stanford scientist who temporarily went to Cetus to do some work for about six months at Cetus and learned about PCR at Cetus, which was, you know, cutting edge and new at the time. The issue there was Halodny's contribution to the patents was based upon his PCR work done at Cetus that he brought back to Stanford. And then Dr. Halodny's co-inventors, Dr. Merrigan and Dr. Israelski, they did additional work. But Roche, which is at Cetus, owned that particular portion, Halodny's portion of the patent, because it was based on the work that he did at Cetus. And it could not have been complete conception because there were additional inventors, you know, just like here, that were done at the joint. Didn't the district court there say that Halodny, that the conception was done while Halodny was visiting Cetus, but the work was not completed, i.e. reduced to practice until after, but that conception was, in fact, complete? I think that's kind of the first half of the sentence, the second half of which you quoted. Yeah, you know, the district court, Your Honor, made two statements in that case. She used the word conceived when Halodny developed the PCR assay, although I think one could read that to be, you know, Halodny's work, Halodny's conception of his portion of the joint invention, because later in the opinion, the district court judge, Judge Patel, said clearly the work performed at Stanford by Halodny, Merrigan, and Israelski was not insubstantial. So there was definitely additional work by Stanford scientists done at Stanford, but Halodny's sort of conceptive intellectual mental work was done while he was at Cetus, before he returned to Stanford. Can I ask you just one more question for me? Of course. You have a district court case pending, right, which has been stayed while the ITC proceeding is underway. Is that right? I believe that's correct. And because of the absence of issue preclusion in that case, would you still be free to make an argument based on the, what is it, the April 15, 2011 email that referred, in which Saxenoff says, you know, Ben says let's use beads or something like that, in a way that you were barred from doing here by Order 43? Your Honor, I haven't, I don't have a. Okay, I'm not asking for a commitment. Yeah, I don't believe we would be precluded by any evidentiary decision made at the ITC, but I don't have a hard commitment to give you on that. Okay, well, I believe we would not. I think we have fairly long-standing case law that ITC decisions don't generate issue preclusion, or maybe any kind of preclusion. That I don't remember. Okay. Any further questions from the bench? Okay. Hearing none, I thank all counsel and say the case is submitted, and that concludes our session for this morning. The Honorable Court is adjourned from day to day.